U.S. Department of Justice

*United States Attorney*
*District of Maryland*

FILED ___ ENTERED
LOGGED ____ RECEIVED
12:48 pm, May 10 2024
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

AUSA Matthew P. Phelps
Assistant United States Attorney
Matthew.phelps@usdoj.gov

*Mailing Address:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*Office Location:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*DIRECT: 410-209-4920*
*MAIN: 410-209-4800*

May 6, 2024

Cara Halverson
Ned Smock
Assistant Federal Public Defenders
District of Maryland – Greenbelt
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
*Via Email to Cara_Halverson@fd.org*

    Re:    United States v. William Patrick Mitchell, et al.,
              Criminal No. 1:21-cr-0090-SAG

Dear Counsel:

    This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, William Patrick Mitchell (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **May 7, 2024 at 6:00 pm EDT**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense(s) of Conviction

1.    The Defendant agrees to plead guilty to Counts One and Two of the Superseding Indictment, which charge the Defendant with Conspiracy and Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 371 and 1346. The Defendant admits that the Defendant is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offenses

2.    The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

    a) As to Count One, that on or about the dates alleged in the Superseding Indictment, in the District of Maryland:

        1. That two or more persons agreed to commit an offense against the United States;

2. The Defendant was a party to that agreement;

3. The Defendant joined the conspiracy, knowing of its objective to commit an offense against the United States, and intending to join together with at least one other co-conspirator to achieve that objective; and

4. That at some time during the existence of the conspiracy, at least one of its members performed an overt act in order to further the objective of the conspiracy.

b) As to Count Two, that on or about the dates alleged in the Superseding Indictment, in the District of Maryland:

1. The Defendant knowingly devised or participated in a scheme to defraud the Defendant's employer of its right to the honest services of the Defendant through bribery or kickbacks;

2. The defendant did so knowingly and with the intent to defraud;

3. The scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of fact; and

4. In advancing, furthering, or carrying out the scheme to defraud, the Defendant transmitted, or caused to be transmitted, any writing, signal, or sound by means of a wire communication in interstate commerce.

## Penalties

3. The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 371 | n/a | 5 years | 3 years | $250,000 or twice the gain or loss | $100 |
| 2 | 18 U.S.C. § 1346 | n/a | 20 years | 3 years | $250,000 or twice the gain or loss | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

Rev. August 2018

2

   b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

   c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

   d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

   e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

   f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The

jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

  c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

  d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

  e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

  f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

  g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

  h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

    a. This Office and the Defendant do not agree on the base offense level. The disagreement is as follows:

        i. This Office maintains that the Defendant's base offense level is 14 under U.S.S.G. § 2C1.1(a) because the Defendant meets the definition of a public official under the Guideline.

        ii. The Defendant maintains that the Defendant's base offense level is 12 under U.S.S.G § 2C1.1(a) because the Defendant does not meet the definition of a public official under the Guideline.

    b. This Office and the Defendant agree there is a 2-level enhancement under U.S.S.G. § 2C1.1(b)(1) because there was more than one bribe.

    c. This Office and the Defendant agree there is an 8-level enhancement under U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(E) because the total bribes paid were more than $95,000, but less than $150,000.

    d. This Office and the Defendant disagree on the total adjusted offense level.

        i. This Office maintains that the Defendant's total adjusted offense level is 24.

        ii. The Defendant maintains that the Defendant's total adjusted offense level is 22.

    e. This Office does not oppose a **2-level** reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's

involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.   There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.   Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9.   At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10.   In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a.   The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

   b.   The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

        i.      The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

        ii.     This Office reserves the right to appeal any sentence below a statutory minimum.

      c.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

11.     The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12.     Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: A money judgement of not less than $95,000, but not more than $150,000.

13.     The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14.     The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Restitution

16.     The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses, which the parties stipulate is at least $164,453. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation, including for conduct that does not relate to a count of conviction because such conduct gave rise to this Plea Agreement. The Government agrees that $111,966.28 shall be credited against the restitution order for amounts the Defendant has already repaid. The total amount of remaining restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

### Defendant's Conduct Prior to Sentencing and Breach

17.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither

the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

19. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

20. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

Matthew Phelps
Christine Goo
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

5/2/24
Date

William Patrick Mitchell

Rev. August 2018

9

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

_5/9/24_  
Date

_[signature]_  
Cara Halverson  
Ned Smock

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

### Introduction

At all times relevant to the Superseding Indictment, Defendant **WILLIAM PATRICK MITCHELL** ("**MITCHELL**") was a resident of Cambridge, Maryland. **MITCHELL** also owned a home in Sarasota, Florida.

The Maryland Broadband Cooperative, Incorporated ("MdBC") was a not-for-profit corporation whose purpose was to work with internet service providers to offer broadband internet service to under-served and un-served areas in Maryland. For a fee, public and private entities could join the cooperative and gain access to the broadband infrastructure that MdBC installed. MdBC's office was located at 2129A Northwood Drive, Salisbury, Maryland 21801.

Beginning in 2006, **MITCHELL** worked as a construction manager for MdBC, and in March 2009, the Board of Directors promoted **MITCHELL** to President and Chief Executive Officer ("CEO"). **MITCHELL** was awarded an annual salary as President and CEO and the Board of Directors typically awarded **MITCHELL** an annual bonus, which was approximately 20% of his salary.

Wayne Kacher ("**KACHER**") was the president and owner of Bel-Air Underground, Inc. ("BAU"), a company that is principally located in Baltimore County, Maryland. BAU frequently acted as a subcontractor on projects for MdBC. **KACHER** was also the president and owner of Pro Comm Engineering and Locating Services, LLC ("Pro Comm"), which was principally located in Baltimore, County Maryland. Pro Comm also acted as a subcontractor on projects for MdBC.

### The Cooperative Agreement

The United States Navy (hereafter "Navy") maintained the Patuxent River Naval Air Station (hereafter "Pax River") in St. Mary's County, Maryland. Pax River hosted, among other tenants, the Naval Air Warfare Center Aircraft Division ("NAWCAD"). NAWCAD's mission is to provide research, development, testing, evaluation and sustainment for all Navy and Marine Corps aircraft systems.

The Atlantic Test Ranges ("ATR") of the NAWCAD provided the open air range environment in support of the Navy's principal Research, Development, Test & Evaluation for Naval aircraft, engines, avionics, aircraft support systems and ship/shore air operations, fleet readiness training and experimentation. The National Aeronautics and Space Administration ("NASA") maintains a facility on Wallops Island, Virginia, which is located on the Eastern Shore

of Virginia. ATR maintained a partnership with NASA's Wallops Island wherein the Wallops airfield provided target launch facilities, refueling capabilities, and a communications and telemetry relay back to the ATR Range control room at Pax River.

On September 26, 2008, NAWCAD entered into a cooperative agreement with MdBC "for the deployment of technology supporting infrastructure; specifically world-class broadband networks across the rural communities of Eastern, Southern and Western Maryland." Cooperative Agreement, Award/Contract N00421-08-2-00 01 (hereafter "Broadband Agreement"). The Broadband Agreement stated that NAWCAD and MdBC had overlapping goals – MdBC sought to build-out broadband networks throughout the Eastern Shore of Maryland, and NAWCAD sought to install a fiber optic broadband connection from NASA Wallops Island to Pax River to enhance the communications capacity between those locations. Through the Broadband Agreement, NAWCAD and the Navy agreed to fund MdBC's installation of broadband infrastructure from NASA Wallops Island to NAWCAD – a project that the parties referred to as the "Pax River Project." MdBC would also be able to use that broadband infrastructure to provide broadband internet access to customers on the Eastern Shore.

Cooperative agreements for the armed services were governed by the Department of Defense Grant and Agreement Regulations. Cooperative agreements were similar to grants in that they fund or stimulate a public purpose, but unlike a grant, cooperative agreements involve ongoing management from the federal government. *See* 31 U.S.C. § 6305; 32 C.F.R. § 21.640.

The Broadband Agreement initially required the Navy to pay MdBC $9,748,633.75. The Navy and MdBC modified the Broadband Agreement several times from 2008 to 2018, and the Navy ultimately paid MdBC $24,527,278.70 under the Broadband Agreement. MdBC completed its work under the Broadband Agreement in 2020. The Navy paid MdBC more than $10,000 in every calendar year from 2014 to 2018.

From 2014 to 2018, MdBC paid BAU more than $11 million. Of that amount, approximately $7.9 million was for work on the Pax River Project. From 2014 to 2018, MdBC paid Pro Comm approximately than $450,000.

### The Kickback Scheme

On August 1, 2014, MdBC made two payments to BAU totaling $250,000 for work on the Pax River Project. That day, **KACHER** wrote a check for $25,000, and he made the check payable to cash. **KACHER** endorsed the check and used it to purchase an official check, also known as a cashier's check, in the same amount. **KACHER** then endorsed the official check and signed it over to **MITCHELL**.

On October 30, 2014, MdBC wrote two checks to BAU for work on the Pax River Project totaling $156,000. On October 31, 2014, **KACHER** wrote a $20,000 check drawn on a BAU bank account and made the check payable to cash. **KACHER** endorsed the check and used it to purchase an official check from M&T Bank in the same amount. **KACHER** endorsed the official check and signed it over to **MITCHELL**.

On December 11, 2014, MdBC made two payments to BAU for a total of $250,000 for work on the PAX River Project. On December 11, 2014, **KACHER** wrote a $20,000 check drawn on a BAU bank account and made the check payable to **KACHER**. **KACHER** endorsed the check and used it to purchase an official check from M&T Bank in the same amount. **KACHER** endorsed the official check and signed it over to **MITCHELL**. That day, **MITCHELL** negotiated the official check, depositing $15,000 into his personal M&T Bank account ending in x3748 and withdrawing $5,000 in cash. **MITCHELL's** $15,000 deposit was wired from an M&T Bank branch in Maryland to M&T Bank's servers in Buffalo, New York.

On October 16, 2016, **MITCHELL** signed a contract with Eastern Shore Pole Buildings for the installation of a detached garage at **MITCHELL's** residence for $36,419. The contract required 60% of the purchase price, or $21,721.80 be paid at signing, with the balance to be paid upon completion. On October 17, 2016, MdBC issued a check to BAU in the amount $467,364.50 for work on the Pax River Project. On October 19, 2016, **KACHER** wrote a check to Eastern Shore Pole Buildings for $21,721.80, which is 60% of the purchase price that was owed for the detached garage on **MITCHELL's** property.

On November 1, 2016, MdBC issued a check to BAU for $50,000 for work on the Pax River Project. On November 8, 2016, **KACHER** paid $3,000 to Peninsula Cabinets to pay for work performed at **MITCHELL's** residence in Cambridge, Maryland. On November 8, 2016, **KACHER** paid $6,800 to Value Carpet for carpets that were installed at **MITCHELL's** residence in Cambridge, Maryland. On November 18, 2016, **KACHER** paid $10,972.61 to Delmarva Power Sports to purchase an all-terrain vehicle for **MITCHELL**.

On November 23, 2016, MdBC made three payments to BAU for work on the Pax River Project for a total of approximately $730,000. Six days later, on November 29, 2016, **KACHER** paid the remaining balance for the detached garage to Contractor 1 in the amount of $14,697.20.

**MITHCELL** solicited and accepted all of the foregoing payments from **KACHER** because of and in exchange for the work that MdBC was subcontracting to BAU and Pro Comm.

### The Embezzlement Scheme

**MITCHELL** was authorized to use an MdBC credit card for MdBC-related business. **MITCHELL**, however, frequently used his MdBC credit card and MdBC funds for personal purchases. For example, **MITCHELL** spent at least $68,060 of MdBC's funds to pay for docking fees, maintenance, and sound and lighting enhancements for his personal boat, "Reelin Fiber," which **MITCHELL** docked at two marinas in Sarasota, Florida. In 2018, **MITCHELL** and another MdBC employee spent more than $20,000 of MdBC's funds to take themselves and their families on a vacation to Costa Rica. Also in 2018, **MITCHELL** used more than $80,000 of MdBC's funds to pay for renovations to his home in Cambridge, Maryland.

**MITCHELL** claimed that many of his personal expenses were marketing and other business expenses that he incurred on behalf MdBC. From April 8, 2016 until his termination in 2019, **MITCHELL** used his MdBC credit card for approximately $164,453 in personal expenses. The United States agrees that **MITCHELL** has returned $111,966.28 to MdBC.

Rev. August 2018

SO STIPULATED:

_____
Matthew Phelps
Christine Goo
Assistant United States Attorneys

_____ 5/7/24
William Patrick Mitchell
Defendant

_____
Cara Halverson
Ned Smock
Counsel for Defendant