**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | | |
| | ) | | |
| v. | ) | **No.   SAG-21-cr-00090** | |
| | ) | | |
| **WILLIAM PATRICK MITCHELL,** | ) | | |
| | ) | | |
| Defendant. | ) | | |
| | ) | | |

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

**Introduction**

On October 4, 2024, at 10:00 a.m., Mr. Mitchell will be sentenced for one count of Conspiracy to Commit an Offense against the United States, in violation of 18 U.S.C. § 371; and one count of Honest Services Wire Fraud, in violation of 18 U.S.C. § 1346.[1] At that time, Mr. Mitchell, consistent with the relevant sentencing factors under 18 U.S.C. § 3553(a), will ask the Court to impose a sentence of three (3) years' probation.[2]

**RELEVANT FACTS AND BACKGROUND**

In 2006, the Maryland Broadband Cooperative (MdBC) was created to address concerns about the lack of affordable and reliable internet service in Maryland. The cooperative's intended goal was to bring internet services to rural and underserved communities around the state by leveraging private membership fees with state and federal funding.

---

[1]     Mr. Mitchell's Final Presentence Investigation Report (PSR), docketed as ECF No. 189, erroneously states that Mr. Mitchell pled guilty to 18 U.S.C. § 666(a)(1)(B), and 18 U.S.C. § 666(a)(2). This was an error that defense counsel and the government failed to catch when the parties were submitting objections. However, Mr. Mitchell would ask that the Court require U.S. Probation to file an amended report correcting that error.

[2]     Mr. Mitchell is not opposed to home detention as a condition of his probation.

In 2008, pursuant to that goal, MdBC entered into a cooperative agreement with the United States Navy.[3] The agreement (referred to as the "Pax Project") involved MdBC building broadband network infrastructure throughout the Eastern Shore of Maryland. The Navy would use the infrastructure to improve its communication with NASA Wallops Island and Pax River, and in turn, MdBC would seek fees from its cooperative's members to use the same infrastructure for broadband internet access. Ten years after its inception, the Pax Project was successfully completed; MdBC laid miles of fiber optic cable on the Eastern Shore of Maryland, including nine (9) miles of cable under the Chesapeake Bay, which allowed for a secure path for military communications between Wallops Island and Pax River. MdBC also ran cable across the Chesapeake Bay Bridge, which no company before had managed to accomplish.

However, in 2014, during the height of the Pax Project's construction, MdBC shifted its cable-laying work away from its previous contractor and awarded it to another: Bel Air Underground (BAU), a company owned by Wayne Kacher. To reward MdBC's CEO for making the shift, Mr. Kacher endorsed three checks over to Mr. Mitchell, totaling $65,000. Those checks were promptly deposited into Mr. Mitchell's personal bank account, and no one was told of their existence. Then, in 2016, Mr. Kacher paid for the construction of a pole barn on Mr. Mitchell's personal property, the installation of new carpets and cabinetry in his personal home, and an all-terrain vehicle for Mr. Mitchell's personal use. During the time Mr. Kacher made these personal payments to, and on behalf of Mr. Mitchell, BAU continued to bill MdBC for the work it completed on the Pax Project and Mr. Mitchell, as CEO of MdBC, continued to award MdBC's subcontracting construction needs to BAU. Neither Mr. Mitchell, nor Mr. Kacher made the

---

[3]     Importantly, at the time the Navy awarded the cooperative agreement, Mr. Mitchell was working at MdBC as a project manager and had not yet been elevated to CEO. His promotion to CEO happened in 2009.

MdBC Board of Directors, the U.S. Navy, or its companies' financial officers, aware of the personal payments. In sum, these "kickbacks" totaled $122,191.61. *See* ECF No. 153 at 12-13.

Also in 2016, Mr. Mitchell used MdBC's company credit card to cover additional personal expenses. Notwithstanding that his personal expenses could be "backed-out" of his annual bonus, Mr. Mitchell misappropriated approximately $164,453 of MdBC funds to pay for, among other things, his personal boat's docking fees in Florida, and, with the collusion of his Chief Financial Officer (CFO), an expensive personal vacation to Costa Rica for his and the CFO's families. In January 2017, a former employee of MdBC met with the Federal Bureau of Investigation (FBI) to relay concerns that Mr. Mitchell and MdBC's Board of Directors were participating in financial mismanagement.[4] In December 2018, after conducting interviews with that employee and others, the FBI signed and executed search warrants for MdBC, BAU, and Mr. Mitchell's personal residences.

On April 8, 2021, a federal grand jury sitting in the U.S. District of Maryland, indicted Mr. Mitchell with four counts of Honest Services Wire Fraud, in violation of 18 U.S.C. § 1343 and 1346; five counts of Bribery Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)(1)(B); and three counts of Theft Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)(1)(A). *See* ECF No. 1. On May 13, 2021, Mr. Kacher was charged in a superseding indictment with Mr. Mitchell, adding the shared charges of Conspiracy to Commit Offenses Against the United States, in violation of 18 U.S.C. § 371. *See* ECF No. 9. Also in that superseding indictment, Mr. Mitchell was charged with Embezzlement

---

[4]     In November 2019, Mr. Kray Plunkert retained counsel to file a qui tam action against Mr. Mitchell, Mr. Kacher, and MdBC, based on alleged violations of the False Claims Act under 31 U.S.C. §§ 3729-3733 and the Anti-Kickback Act under 41 U.S.C. § 51. That case ultimately settled and was dismissed in March 2024. *See United States et al v. Maryland Broadband Cooperative et al*, Civil Case No. 19-cv-3375.

Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)(1)(A). *Id*. On

September 1, 2023, this Court set a joint trial of Mr. Kacher and Mr. Mitchell for May 13, 2024.

*See* ECF No. 83. On May 10, 2024, this Court accepted a plea agreement between Mr. Mitchell

and the government. *See* ECF Nos. 152-154. The Court ordered Mr. Mitchell to cooperate with a

Presentence Investigation Report and set his sentencing for October 4, 2024. *See* ECF No. 155.

Mr. Kacher opted to proceed to trial and was found guilty of all counts in the indictment. *See*

ECF No. 181.

## APPLICABLE LEGAL PRINCIPLES

Federal law expressly favors liberty over incarceration insofar as the purposes of

promoting correction or rehabilitation are concerned. To that end, 18 U.S.C. § 3582 states:

> The court, in determining whether to impose a sentence of imprisonment, and, if a term
> of imprisonment is to be imposed, in determining the length of the term, shall consider
> the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing**
> **that imprisonment is not an appropriate means of promoting correction and**
> **rehabilitation.**

(Emphasis added.)

Under § 3553(a), the Court is directed to "impose a sentence sufficient, but not greater

than necessary, to comply with the purposes of [sentencing]." Such factors include the "nature

and circumstances of the offense and the history and characteristics of the defendant and the

need for the sentence imposed." 18 U.S.C. § 3553(a). To determine the "need" for the sentence,

the Court should consider if and how a term of incarceration would "reflect the seriousness of the

offense, promote respect for the law, and provide just punishment for the offense." *Id*. at 2(A).

Additionally, the Court should consider how a sentence would "afford adequate deterrence to

criminal conduct," "protect the public from further crimes of the defendant," and "provide the

defendant with needed educational or vocational training, medical care, or other correctional

4

treatment in the most effective manner." *Id*. at 2(B-D). Further, the Court must be mindful of "the kinds of sentences available" and the Guidelines and policy statements issued by the Sentencing Commission, including the indicated Guidelines range. *Id*. at 3-5.

## I.     GUIDELINES CALCULATION

The Guidelines applicable to Mr. Mitchell's conduct are found under U.S.S.G. § 2C1.1, covering the conduct of bribes, deprivation of honest services, and defrauding by interfering in governmental functions. Section 2C1.1 specifies that a defendant's Base Offense Level should be determined as follows:

> (a)     Base Offense Level:
>
>     (1)     **14**, if the defendant was a public official; or
>
>     (2)     **12**, otherwise.

Section 2C1.1 also clarifies that the term "public official" should be construed broadly, and include the following definitions:

> . . .
> (E) An individual who, although not otherwise covered by subdivisions (A) through (D): (i) is in a position of public trust with official responsibility for carrying out a government program or policy; . . . or (iii) participates so substantially in government operations as to possess de facto authority to make governmental decisions (e.g., which may include a leader of a state or local political party who acts in the manner described in this subdivision).

U.S.S.G. § 2C1.1, app. note 1.

Taken together, § 2C1.1 makes clear that if an individual was a public official at the time of his bad conduct, or if he held the power of a public official, by overseeing government programs or maintaining the authority to make government-level decisions, he should be assigned a higher Base Offense Level.

5

Likely, the government will contend that Mr. Mitchell was a public official and because of that, he should receive the higher Base Offense Level of 14. However, in making that argument, the government misunderstands how courts have applied the definitions of public officials under § 2C1.1. Without hiccup, the courts have determined individuals should be considered public officials under § 2C1.1(a)(1), if at the time of their conduct, the individual was employed by a governmental entity, either as a direct employee or contractor. *See United States v. Quinn*, 359 F.3d 666, 670 (4th Cir. 2004) (employees of the Executive Office for Asset Forfeiture within the Department of the Treasury were public officials); *United States v. Dodd*, 770 F.3d 306, 308 (4th Cir. 2014) (correctional officers at a facility that contracts with the Federal Bureau of Prisons to house federal inmates were public officials); *States v. Conrad*, 760 F. App'x 199, 200 (4th Cir. 2019) (employees of the United States Department of Commerce were public officials); *United States v. Carrasco*, No. 21-1396, 2023 WL 5524854, at *12 (1st Cir. Aug. 28, 2023) (attorney retained by three municipalities was a public official); *United States v. Jones*, 260 F. App'x 873, 878 (6th Cir. 2008) (an independent contractor working for the Tennessee Department of Safety was a public official); *United States v. Reese*, 681 F. App'x 846, 849 (11th Cir. 2017) (employees of the County's Transit Authority were public officials).[5] In other words, if the individual worked for the government as a direct hire, or assumed the role of a government official, he should be considered a public official under § 2C1.1. But, if the individual is a private citizen that was not employed by the government and did not hold himself out as an official, then application of the higher Base Offense Level is inappropriate.

---

[5]     Importantly, Mr. Mitchell did not plead guilty to 18 U.S.C. § 201, which criminalizes the bribery of *public officials* and witnesses, and where many of the cited cases stem. Mr. Mitchell instead plead guilty to conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371; and honest services wire fraud, in violation of 18 U.S.C. § 1346. Neither statute assumes, nor requires, that the individual charged be a public official.

In this case, Mr. Mitchell is not a public official and therefore, his Base Offense Level is 12. He was neither employed by the government, nor did the Navy directly pay his salary. He was not in a position of public trust; he was in a position of fiduciary trust to his private cooperative's members and Board of Directors. Mr. Mitchell did not have the authority to make government decisions; the U.S. Navy was the entity authorized to make those decrees. Mr. Mitchell oversaw *MdBC's* subcontractors, but that is markedly different than overseeing the *Navy's* decisions. Here, it was not the Navy official that accepted a kickback; it was the private CEO of a cooperative that did. To find that an executive of a private company was a public official solely because the company's funding portfolio included government money would stretch the meaning and intent of the Guidelines beyond recognition. In fact, counsel was unable to find any cases where the CEO of a private company *was* determined to be a public official. The plain language, application notes, and the caselaw support that Mr. Mitchell was not a public official and his corresponding Base Offense Level is 12.

Moving forward, the parties do agree Mr. Mitchell is subject to a 2-level enhancement for accepting more than one bribe, pursuant to U.S.S.G. § 2C1.1(b)(1). The parties also agree that an 8-level enhancement applies because the total bribes paid were more than $95,000, but less than $150,000. *See* U.S.S.G. §2C1.1(b)(2) and §2B1.1(b)(1)(E). Therefore, Mr. Mitchell's adjusted offense level is 22. After 2-levels off for being a zero-point offender,[6] and another 2-levels off

---

[6]     Notably, the Sentencing Commission in application note—note 10(B)—to Guideline § 5C1.1, stated:

> A departure, *including a departure to a sentence other than a sentence of imprisonment*, may be appropriate if the defendant received an adjustment under §4C1.1 ... and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." (Emphasis added.)

for acceptance of responsibility, his final base offense level is 18. *See* U.S.S.G. §§4C1.1(a) and

(b); U.S.S.G. §3E1.1(a).[7] With an uncontested criminal history score of zero, Mr. Mitchell's

criminal history category is I, indicating an estimated Guidelines range of 27 to 33 months of

incarceration.

## II.    ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS

Notwithstanding his estimated Guidelines range, a sentence of three years' probation, is a

sentence sufficient, but not greater than necessary, to fulfill the purposes enumerated under 18

U.S.C. § 3553(a). Taking into consideration the nature and circumstances of Mr. Mitchell's

offense, his history and characteristics, and the need for the sentence imposed, a sentence of

probation is just.

### a.    <u>Nature and Circumstances of Mr. Mitchell's Offenses</u>

Make no mistake, Mr. Mitchell committed significant offenses. He took kickbacks from a

subcontractor and improperly diverted his company's funds for personal expenses. Mr. Mitchell

admits and takes full responsibility for his actions. However, the Court should recognize that

because this is an economic offense, there are key differences in the harm caused to society when

compared with violent offenses. Additionally, there are some mitigating facts about Mr.

Mitchell's conduct and his time as CEO, that are worthy of the Court's consideration.

First, the U.S. Navy's contracted work was performed, performed completely, and

performed well. There was never any indication, complaint, or finding, that the work performed

for the U.S. Navy was done incorrectly, incompletely, or at an inflated price. Though there was

---

This provision suggests that even though Mr. Mitchell's total-offense level falls within Zone D,
he should be considered for a noncustodial sentence, so long as his offense was not "a crime of
violence" or "an otherwise serious offense."

[7]    Because Mr. Mitchell did not plead guilty in a timely manner, the government did not to
extend the additional 1-level off under U.S.S.G. §3E1.1(b).

some supposition during the trial of Mr. Kacher that MdBC could have used less-expensive contractors to complete the work, and thus, passed those cost-savings on to the U.S. Navy, it remained just that: supposition. Even if it is true that the work could have been performed more cheaply by another, there is nothing to suggest that the U.S. Navy would have been similarly satisfied with the low-bidder's work. From the U.S. Navy's perspective, it defined the scope of work to meet its requirements, selected a vendor based on its ability to deliver against the contract, the work was completed successfully, and the contract was fulfilled and paid as intended without issue. This is simply not a case where no service or poor service was performed to the detriment of the government. To the contrary, Mr. Mitchell as CEO of MdBC provided the government with precisely the services it required.

Second, MdBC is a cooperative that generated nine (9) million dollars in revenue last year and pays its current CEO a salary of over $300,000 (not including his bonus which totaled $72,000).[8] MdBC is not a poor "mom and pop" shop, or one that, by any stretch of the imagination, should be construed as vulnerable. In fact, its lack of vulnerability is largely thanks to the growth and development of the company under Mr. Mitchell's 10 years of leadership. Additionally, MdBC's own Board of Directors also practiced its own unsavory financial practices, including private boating and fishing excursions, as well as box suites at the Ravens

---

[8]    *See* Exhibit 1: MdBC's 2023 filing to the IRS. MdBC is classified as a 501(c)(12), a business entity that qualifies for a tax exemption from the I.R.S. because 85 percent of its yearly income is derived from its members. *See* Michael Seto and Cheryl Chasin, *General Survey of I.R.C. 501(c)(12) Cooperatives and Examination of Current Issues*, https://www.irs.gov/pub/irs-tege/eotopice02.pdf (accessed September 19, 2024). MdBC's members include large telecommunication companies like Verizon and Xfinity that provide "last-mile" internet connection to customers for profit.

games, and even terminating an employee who dared to act as a whistle blower.[9] Far from being

the cause, Mr. Mitchell was but a symptom, of the cooperative's larger financial

mismanagement.

Third, Mr. Mitchell, in accepting his wrongful conduct and wanting to make right his

wrongs, has already paid MdBC the lion's share of its restitution. According to the government,

Mr. Mitchell wrongly billed MdBC $164,353 for his personal expenses. In March of 2019, mere

months after his termination, but before he was indicted, Mr. Mitchell entered into a promissory

agreement with MdBC wherein he agreed to pay the company $93,128.06, which were proceeds

from the sale of his Maryland home. He also contributed another $18,838.22 to the balance,

leaving just $52,386.72 in actual restitution still owed. That means Mr. Mitchell, even before his

indictment, managed to repay MdBC approximately 70% of what was owed.

Certainly, the Court cannot overlook the seriousness of Mr. Mitchell's offense. But that

Mr. Mitchell has already paid the majority of restitution, that MdBC had a ready-made culture of

misusing funds, and that the U.S. Navy, the benefactor of MdBC's work, was completely

satisfied with the Project, are circumstances that should influence the weight of this factor in the

Court's sentencing decision.

**b.   <u>History and Characteristics of Mr. Mitchell</u>**

William Patrick Mitchell was born on ▮▮▮▮▮▮, 1966, in Salisbury, Maryland. He has

one sister, Amy, and the family unit enjoyed the benefits of a middle-class lifestyle. Mr.

Mitchell's father worked as a Trooper for the Maryland State Police, and his mother worked as

---

[9]      *See United States et al v. Maryland Broadband Cooperative et al*, U.S.D.C. Maryland
Civ. Case No. 19-cv-03375 at ECF 1, ¶¶ 178-184 (describing the Relator's ultimate termination
from the company).

the manager of a women's clothing store in Selbyville, Delaware. Mr. Mitchell remembers having a content childhood, full of love and support.



*Mr. Mitchell as a young child with his father.*

While growing up, Mr. Mitchell excelled at outdoor activities, like hunting and fishing, and even became an Eagle Scout at age 16. He did well in school, making above-average grades and graduating from Wicomico Senior High School in 1984. Though Mr. Mitchell remembers his parents as being strict, he was always provided for and remembers having family dinner each night at the kitchen table. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

After graduating from High School, Mr. Mitchell started vocational technical classes to become an electrician. In 1985, he joined the electrical union affiliated with the International Brotherhood of Electrical Workers (IBEW), local 24, and began his apprenticeship. After four

years of intense supervision and classes, Mr. Mitchell attained the rank of journeyman.[10] He then
went to work for a local electric company, Newcomb Electric. He started as a lineman, but later
moved up the ranks to become a superintendent overseeing jobs.

While working for Newcomb in 1992, Mr. Mitchell met his wife, Peggy. The pair
married two years later in October 1994.



*The Mitchells on their wedding day and as a young couple.*



---

[10]     Meaning he completed his official apprenticeship qualification and was fully authorized
to work in his field as a qualified expert. *See* https://en.wikipedia.org/wiki/Journeyman.



*Mr. Mitchell holding Cody shortly after he was born*



Around the same time as Cody's birth, Mr. Mitchell left Newcomb Electric for Bell Atlantic, where he worked as a service technician. The pay and benefits were much better, and over time, just like at Newcomb, Mr. Mitchell moved up the corporate ladder to become a local supervisor. In 2000, Bell Atlantic was acquired by Verizon, where Mr. Mitchell continued to work in mid-level management.

Then, in 2006, Mr. Mitchell left Verizon to work for a new start-up cooperative, MdBC. At the time, Mr. Mitchell was the cooperative's first employee, and he operated it from his home in Cambridge, Maryland. From the very beginning, Mr. Mitchell's work for Maryland Broadband was a labor of love, acutely focused on bringing Rural Maryland forward with access to high-speed internet. Once elevated to CEO in 2009, Mr. Mitchell was charged with overseeing all the construction needs of the company, getting cable in the ground, managing all operations and personnel,[11] and growing the cooperative's membership base. The latter responsibility, bringing in new members so additional revenue could be generated, was of particular focus to the Board of Directors. After three years with Mr. Mitchell at the helm, MdBC amassed $30 million in assets. After five years, the cooperative moved to a permanent building structure, employed 10 employees, increased its membership to near 70, and built over 500 miles of fiber. Along the way, Mr. Mitchell took the time to have MdBC sponsor local community activities and organizations including local little leagues, volunteer fire departments, Big Brothers/Big Sisters, Chambers of Commerce, Junior Achievement, and many other worthy causes in the rural portions of Maryland. Under Mr. Mitchell's leadership, MdBC became the healthy cooperative it is today.

Around 2008/2009, just as Mr. Mitchell poured hours into building MdBC, his son Cody, began to pour hours into playing baseball. He showed not only an affinity for the game, but real, raw talent. ███████████████████████████████████████████ ███████████████████████████████████████████████████████████. In 2009, Mr. Mitchell and Peggy purchased a home in Sarasota, Florida. This new abode perfectly

---

[11]     He even allowed MdBC employees to stay at his home when jobs were being completed on the Eastern Shore.

positioned Cody to continue to explore baseball and compete at the highest levels for his age group. In 2011, Peggy and Cody left Maryland to live in Florida full-time, to better help facilitate Cody's passion.



*Cody with his many baseball teams over the years.*
*Mr. Mitchell also is seen in these team pictures as he was a large supporter of the different teams.*

But this move, this separation into two households, later caused a great amount of economic uncertainty for the Mitchells. Peggy stopped working when she moved to Florida, which put the financial needs solely on Mr. Mitchell's shoulders. And because Mr. Mitchell was not physically

with his family, he felt an immense pressure to make sure his wife and son had everything they needed in Florida. Even though Mr. Mitchell was paid a healthy salary from MdBC at the time, he struggled to afford the two households. And he struggled with coming clean with Peggy about their money troubles. Mr. Mitchell's job was in Maryland, and he was being praised and lauded for his successes, Peggy was happy in Florida, and Cody was getting excellent attention and training for his sport; Mr. Mitchell did not have it in him to call his wife and son back to Maryland. He felt he had to make it work. But, despite himself, and partially aided by Peggy in Florida, the Mitchells, in two separate households, began living beyond their means. It was this financial pressure that became the impetus of Mr. Mitchell accepting Mr. Kacher's kickbacks and using his company credit card to pay for personal expenses.[12]

However, the Court should note that Mr. Mitchell is incredibly remorseful for his actions. He has been living alone in Maryland, away from his wife and son, since 2011. He did it to build a company that he loved, filled with employees he genuinely cared about. After he was indicted, it took him eight (8) months to find a new position, this time in Virginia. He opted to move there, instead of back with his family in Florida so he could continue to be the breadwinner his family needed. Mr. Mitchell feels terrible about what happened, his reputation is ruined, and he knowns he will never be allowed in another executive position, despite his success at growing MdBC. When asked what he lost from actions in this case, Mr. Mitchell replied, "I'm 58 years old and I'm back to being an employee, barely scrapping by. I eat TV dinners every night alone and I

---

[12]      Cody, in his senior year off high school, eventually told his parents he no longer wanted to pursue baseball. After high school, he went on to train as a merchant marine and now captains a private boat. He just married and bought his first home.

live in someone else's home. In 2020 alone, I moved seven times. I lost my home. I don't even

own my own car. I don't get to go home [to Florida]."[13]

### c. <u>The Need for the Sentence Imposed</u>

#### i. <u>Specific Deterrence</u>

In this case, specific deterrence should be of low concern for the Court, given Mr.

Mitchell's lack of any criminal history to date and his infraction-free performance during a three-

years long saga of supervision. Individuals convicted of fraud are some of the least likely to be

rearrested,[14] as are individuals over the age of 60.[15] But even with it being statistically unlikely

that Mr. Mitchell would re-offend, the number of collateral consequences stemming from this

case has well-served as a sufficient specific deterrence for Mr. Mitchell to never again commit a

crime. On paper, Mr. Mitchell lost his beloved title and job, his house, and his financial

standing.[16] His days of being trusted in a high-level executive position are over. But perhaps

---

[13]     *See* Exhibit 2: Character Letters on behalf of Mr. Mitchell.

[14]     *See Recidivism Among Federal Offenders: A Comprehensive Overview*, United States
Sentencing Commission (Mar. 2016) at page 20, available at
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
publications/2016/recidivism_overview.pdf, (accessed Sept. 9, 2024) ("Offenders whose federal
offense involved firearms were most likely to be rearrested (68.3%), followed by those arrested
for robbery (67.3%),immigration (55.7%), drug trafficking (49.9%), larceny (44.4%), other
(42.0%), and fraud (34.2%).")

[15]     *Id*. at 23 ("Offenders sentenced when younger than twenty-one had a 71.1 percent
rearrest rate, compared to 14.0 percent of offenders who are sentenced after age sixty"). Though
Mr. Mitchell will be 58 at the time of his sentencing, he maintains the difference between 58 and
60 is statistically irrelevant.

[16]     Studies have shown that the loss of a job or a home, can be some of the most stressful
events a person may experience in their life. *See* Thomas H. Holmes, Richard H. Rahe, *The
social readjustment rating scale*, Journal of Psychosomatic Research, Volume 11, Issue 2, 1967,
Pages 213-218, ISSN 0022-3999, https://doi.org/10.1016/0022-3999(67)90010-4, available at
https://www.sciencedirect.com/science/article/pii/0022399967900104 (accessed September 6,
2024); *See also*, Cohen S, Murphy MLM, Prather AA. *Ten Surprising Facts About Stressful Life
Events and Disease Risk*. Annu Rev Psychol. 2019 Jan 4;70:577-597. doi: 10.1146/annurev-

even more brutally, Mr. Mitchell has had to navigate the internal scars of losing his career, his reputation, his standing in the eyes of his wife, son, and friends, and any hope of being financially solvent. He spends his days, away from his son and wife, toiling in another state, and working as much as he can to try to mend his conscience and their financial burdens. Mr. Mitchell comes home to a house without his family, after working 10-hour days, filled with shame, embarrassment, and quite frankly, loneliness.

And more broadly, following this conviction, as with other federal felony convicts, Mr. Mitchell will face added hurdles to securing employment and disqualification from receiving certain public benefits. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180-81, 184 (E.D.N.Y. 2016) (explaining that "there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons," and referring to them as "civil death"). Such collateral consequences are appropriate to consider under § 3553(a)'s "just punishment" prong. *See, e.g., United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming sentencing court's consideration of the loss of the defendant's teaching certificate and state pension in granting downward variance as "consistent with § 3553(a)'s directive that the sentence reflects the need for 'just punishment' and 'adequate deterrence'"); *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) (collateral consequence of deportation is a permissible § 3553(a) factor); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (affirming lower court's consideration of conviction's effect on the defendant's future employment opportunities, because "[i]t is difficult to see how a court can

---

psych-010418-102857. Epub 2018 Jun 27. PMID: 29949726; PMCID: PMC6996482, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6996482/ (accessed September 6, 2024) ("Employment difficulties, especially becoming unemployed or being underemployed, have adverse implications for role identity, social status, and financial security and are also associated with deleterious health outcomes.").

properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); *United States v. Jaime*, 188 F. Supp. 3d 262, 265 (D.D.C. 2017) ("[T]he Court is mindful of the potentially devastating collateral consequences of a criminal conviction, including it being an impediment to future employment."); *Nesbeth*, 188 F. Supp. 3d at 187. Additionally, Mr. Mitchell has been living with this case for more than three years. The daily, ever compounding stress of knowing he may go to prison, has certainly provided Mr. Mitchell with a sufficient deterrent. ████████████████████████████████████████████

██████████████████████████████████████ [17]

### ii. General Deterrence

Likely, however, the Court and government may focus on general deterrence as a factor weighing against sentencing Mr. Mitchell to probation, the theory being, that if other white-collar defendants believe they can take kickbacks without incarceration time, they may do so with impunity. However, while this is an attractive logic, it is also a flawed one. Deterrence theory was a driver for lengthening and increasing the surety of sentences to incarceration throughout the expansion of mandatory minimums in the 1980s and 1990s. But an overwhelming body of research shows that people do not order their unlawful behavior around the harshness of any sentence they may face, but instead, around their perceived likelihood of being caught and facing any sentence. [18] In other words, while humans do consider like-peers' consequences for

---

[17] 

[18]    *See* National Institute of Justice, *Five Things About Deterrence* (2016), available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

doing or refraining from certain actions, they do so in a more limited way; humans seem to consider the act of "getting caught" as a much more significant event than the punishment ultimately meted out. So, in reality, it is the certainty of being charged, rather than the consequences of it, that deters behavior. And in this case, Mr. Mitchell was undoubtedly caught. No additional jail time will increase the general population's weariness of committing similar crimes; the government's swift investigation and charging of Mr. Mitchell is all the general deterrence needed.

### d.  **The Need to Provide Restitution**

The remaining restitution owed in this case is $52,386.72. Mr. Mitchell has every desire and motivation to make MdBC (through its insurance company) whole again. Even after Mr. Mitchell was terminated as CEO from the cooperative in 2019, faced federal indictment in 2021, and was subject to pretrial release conditions from 2021 to the present (over three years), he demonstrated his ability and drive to be a productive member of society and support his family. Following his termination, he eventually found work as a self-employed inspector for a fiber optic internet company. He then secured work as a project manager for another fiber optic internet installation company. And now, he works at FS2 Industries as a project manager and where his company has nothing but glowing praise for Mr. Mitchell's work. In fact, his company, being aware of his federal case, declined to terminate his employment, and has promised that it would continue to employ him if he is not incarcerated. This is significant, and an opportunity Mr. Mitchell has leveraged for himself through his hard work. But it is also an opportunity for Mr. Mitchell to further contribute financially to the restitution still owed. Simply put, society would be better served to have Mr. Mitchell working to repay the money, than to have him sitting in a prison. Certainly, being able to make restitution payments, without delay, is

21

within the sentencing goals of 18 U.S.C. § 3553(a). Allowing Mr. Mitchell a sentence of probation would only ensure his continued employment and a source of income to make appropriate reparations for his wrongs.

### e.   The Need to Avoid Unwarranted Sentencing Disparity

Finally, sentencing Mr. Mitchell to a term of probation would not create an unwarranted sentencing disparity. According to the United States Sentencing Commission's Interactive Data Analyzer, in 2023, almost 67% of individuals sentenced under U.S.S.G. § 2C1.1 received a sentence of *less than two years* of incarceration. Only *one-third* were given a straight prison sentence.[19] Interestingly, this was true of individuals classified in Zone D of the sentencing table, meaning the loss amounts and/or enhancements were high. And according to the Judiciary Sentencing Information, during the last five years, 44% of individuals sentenced under § 2C1.1 with a criminal history category of I and a final base offense level of 18, were given downward departures or variances from their Guidelines ranges, and *a full 17%* of individuals were given a probationary (with no incarceration) sentence.[20] Finally, it is worth noting that 18 U.S.C. § 3553(a)(6) admonishes against "unwarranted" sentence disparities, meaning that not all sentencing disparities are created equal. Given the facts of this case, Mr. Mitchell, and the other sentencing factors in play, a sentence of probation is not unwarranted.

---

[19]     *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard, inputs were 2023; District of Maryland; Crime Type: Bribery/Corruption; Guideline: §2C1.1; Sentencing Zone: D; Criminal History: I.

[20]     *See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard, inputs were §2C1.1, Base Offense Level: 18, Criminal History: I, Include Sentence Length Data.

**Conclusion**

A sentence of probation is sufficient, but not greater than necessary, to comply with the purposes of sentencing in this case. Such a sentence accounts for the nature and circumstances surrounding Mr. Mitchell's offense, as well as his history and characteristics. More importantly, a sentence of supervision, paired with his proven track record of law-abidance on pretrial release, shows that a carceral sentence is not needed to maintain the safety of the community. Therefore, after considering all the facts of this case, his individual characteristics, and all the relevant 18 U.S.C. § 3553(a) factors, Mr. Mitchell requests this Court impose a sentence of probation.[21]

Respectfully submitted,

JAMES WYDA
FEDERAL PUBLIC DEFENDER

_____/s/_____
CARA HALVERSON
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
301-344-0600
Cara_halverson@fd.org

---

[21]    If the Court wishes to impose a form of incarceration on Mr. Mitchell, he requests the Court consider placing him on supervised release (following a brief period of incarceration) with the condition that for the first year of his supervision, he be remanded to home detention. Such a sentence would ensure some carceral punishment but would also allow Mr. Mitchell to work and make restitution payments.